**STATE of Missouri, Respondent,**

v.

**Raymond Richard JOHNSON, Appellant.**

**No. 54016.**

Supreme Court of Missouri,
Division No. 2.

Nov. 10, 1969.

Motion for Rehearing or to Transfer to Court
En Banc Denied Dec. 8, 1969.

---

John C. Danforth, Atty. Gen., Jefferson City, John P. Emde, Special Asst. Atty. Gen., St. Louis, for respondent.

Lawrence D. Willbrand, St. Louis, for appellant.

FINCH, Justice.

Defendant was convicted by a jury of burglary of a dwelling and of stealing therefrom and his punishment was fixed at three years for burglary and two years for stealing, the sentences to run consecutively. Defendant appeals. We affirm.

This case, written on recent reassignment, involves primarily the issue of whether the evidence is sufficient to support the verdict and whether the court erred in failing to sustain a motion to suppress evidence seized from the automobile in which defendant was a passenger following the arrest of defendant and his companions on suspicion of burglary and stealing.

Defendant filed a motion for a directed verdict at the close of the State's case and again at the close of all the evidence. We consider only the latter motion because by introducing evidence in his own behalf defendant waived any error in the action of the court in overruling his motion at the close of the State's case. State v. Davis, Mo., 367 S.W.2d 517; State v. Truster, Mo., 334 S.W.2d 104.

In determining whether a submissible case was made, we accept as true all evidence in the record, including inferences reasonably drawn therefrom, which is favorable to the verdict of guilty, and we disregard the evidence and inferences to the contrary. State v. Webb, Mo., 423 S.W.2d 795; State v. Sykes, Mo., 436 S.W.2d 32. In this connection, we consider any portions of defendant's evidence which support a finding of guilty because defendant, by putting on evidence, takes the chance of aiding the State's case. State v. Truster, supra.

On August 3, 1967, at about 9:30 a. m., Mrs. Katherine Sandoz locked their home at 850 Deaver Lane in Creve Coeur, St. Louis County, and went to the place of business which she and her husband operated. She left their dog tied in the basement where he could get in and out of the building. When Mrs. Sandoz arrived home at approximately 9:45 to 9:50 p. m., the dog was barking (something he never did, normally) and wanted to go up the driveway, as though he knew something was up there. Mrs. Sandoz put the car in the garage and went upstairs, where she discovered that the house had been entered. Dresser drawers were open and clothes were strewn over the floor. The covers on the bed were ruffled and one orchid pillowcase with a white floral design was missing.

Mrs. Sandoz called the Creve Coeur Police and her husband. The police came shortly and they then reported the burglary to the St. Louis County Police. Missing were a considerable number of one-dollar silver certificates and other bills of one, two, five and ten-dollar denominations, various coins consisting of silver dollars, Kennedy half dollars, and other currency and old coins (aggregating a little more than five hundred dollars), two ladies' watches, a shoe box containing Eagle Stamp books and Eagle Stamps, two coin purses, a medal, some birthday cards, and three rings belonging to Mrs. Sandoz.

At about 10 p. m. that evening, Officer Farmer of the St. Louis County Police Department was on normal patrol and he stopped his car on Spoede Road at its intersection with Olive Street Road, preparatory to making a right turn to go east on Olive. While he was stopped there, a white Pontiac convertible, going east on Olive, passed at what appeared to be an excessive speed. This intersection of Spoede and Olive Street Roads was a short distance (perhaps two or three blocks) from the Sandoz home.

Officer Farmer followed the Pontiac to the intersection of Olive with Lindbergh (about one mile) and then followed the Pontiac north on Lindberg to check its speed. He found that it was going 50 to 52 miles an hour on Lindbergh, where the speed limit was 40 miles per hour. Farmer could observe three occupants in the Pontiac, two in the front seat and one in the rear. After traveling about two miles on Lindbergh, the officer turned on his red flasher lights and his spotlight and stopped the Pontiac for the purpose of giving a ticket for speeding. He fixed the time when he stopped the other car at 10 to 10:05 p. m.

Officer Farmer went to the drivers' side of the Pontiac where he began to talk to the driver, who proved to be Joe Skaggs. Defendant Johnson was seated in the right front seat, and a third man was in the rear seat. Farmer did not know either Skaggs or Johnson, but he recognized the man in the rear seat as Gerald Raymer, a known police character, whose picture Farmer carried with him. Farmer asked Skaggs to see his operator's license, but Skaggs could not produce one. The interior of the car was well lighted by an aircraft landing light mounted on his patrol car which he left shining into the interior of the Pontiac, and while talking to Skaggs, Farmer observed an orchid colored pillowcase with a white floral pattern between the two front bucket seats. He could not see the contents of the pil-

lowcase but stated it was bulging and was perhaps one-third full. Skaggs was extremely nervous and was stuttering, stammering and shaking. He told Farmer that the automobile belonged to the occupant of the rear seat, Gerald Raymer.

Officer Farmer testified that he did not place anybody under arrest while he was standing by the side of the Pontiac. He took Skaggs back to the police car where he wrote out a ticket for Skaggs for not having an operator's license. Raymer and defendant remained in the Pontiac while he did this. Farmer had reported earlier by radio that he was stopping a car with three occupants and he knew that other officers would arrive shortly because under such circumstances additional officers are routinely dispatched to the scene to assist the officer unless he reports back that additional help is not necessary. He testified that he stalled while waiting for help to arrive.

While Farmer was talking to Skaggs, he asked where they had been and Skaggs mentioned a tavern on Olive Street Road. Farmer patroled that area regularly and the description given did not fit any tavern with which the officer was familiar. He also asked Skaggs where he was going when stopped. Skaggs said that he was going home to Overland, but the officer knew that they already had passed up the most direct route to Overland.

When two detectives drove up in another police car, Officer Farmer informed Skaggs, Raymer and the defendant that they were under arrest on suspicion of burglary and stealing. Defendant and Raymer then were told to alight from the Pontiac, which they did, both leaving the car on the right-hand side. They were frisked and then taken back to the car of Detective Moakley. Officer Farmer and Detective Messina then proceeded to search the Pontiac. Farmer first took out the orchid pillowcase which he had observed when he first stood outside the Pontiac talking to Skaggs. He handed the

pillowcase to Messina and they then searched the rest of the automobile but found nothing further.

Inside the pillowcase they found a steel pry bar (approximately two feet long), a flashlight, two pairs of work gloves, and all the items (except the rings) which had been stolen from the Sandoz residence. The officers then took the three men to the St. Louis County Police Station. Shortly thereafter, Mr. and Mrs. Sandoz arrived and identified the contents of the pillowcase, other than the pry bar, flashlight and gloves, as their property. Mrs. Sandoz also identified the pillowcase as the one which had been taken from their home.

Lt. Thomas Gooch, of the Creve Coeur Police Department, went the next morning to the scene where the Pontiac had been stopped the night before. He had been by there the preceding evening and knew where the car had been stopped. He searched in the trampled grass and weeds looking for the rings which had been taken from the Sandoz home and he found them on the ground "pretty well immediately at the edge of the car door" on the passenger side.

At the trial a chemist testified that he had examined the aluminum door which had been pried open at the Sandoz residence and also had examined the pry bar found in the orchid pillowcase. The pry bar matched the marks on the door and some scrapings found on the pry bar were analyzed and found to match material on the aluminum door at the point where the pry marks were made.

Defendant took the witness stand in his own defense. He testified that he had grown up with Raymer and had gone to high school with him. He said, however, that he had lost contact with Raymer except that he had seen him on a few occasions at the Normandy Bowling Alley. On one of those occasions he had met Joe Skaggs. On cross-examination, the defendant admitted that what he had testified about seeing Raymer only at the bowling

alley was untrue and that he had been with him on January 3, 1967, in Bellefontaine Neighbors, and was with him in St. Louis County on February 19, 1967. Nothing further was developed as to those two occasions or why the men happened to be together at those times.

Defendant further testified that Raymer called him about 5:30 p. m. on August 3, and asked that he meet Raymer and Skaggs for some drinks to celebrate Skaggs' birthday. The defendant agreed to do so and met them at Beil's Tavern on Carson Road at 8 p. m. He was with them until they were stopped by the police on Lindbergh approximately two hours later.

Defendant stated that they left Beil's Tavern at about 8:45 p. m., in Raymer's Pontiac, and went to another tavern on Olive Street Road just east of 244. They were enroute from that place to Normandy Bowling Lanes when they were stopped by the police. Defendant testified that at no time while he was in the automobile did he ever observe the orchid pillowcase between the bucket seats of the Pontiac.

We hold that this evidence, together with reasonable inferences therefrom, was sufficient to make a submissible case and to support the verdict rendered.

Officer Farmer observed the Pontiac containing the defendant and his companions speeding east on Olive Street Road, just a short distance from the Sandoz residence, at approximately 10 p. m. The car thereafter was under constant surveillance by Officer Farmer until it was stopped. When the officer looked into the car as he asked to see the driver's operator's license, he observed between the front bucket seats the flowered orchid pillowcase which had been taken from the Sandoz residence. When it was examined later, it was found to contain all the items taken from the Sandoz residence (other than the rings), and it also contained the pry bar used to enter the Sandoz residence, a flashlight and two pairs of gloves.

The jury could have found that this burglary occurred shortly before Mrs. Sandoz arrived home on the night of August 3 (which would have been shortly before the Pontiac was first seen by Officer Farmer). The actions of the Sandoz dog support such a conclusion. Normally, it did not bark when Mrs. Sandoz came home. This time, it was barking excitedly and wanted to go up the driveway. The presence of the flashlight in the pillowcase in the Pontiac convertible also would support a finding by the jury that the burglary had occurred after dark and just shortly before the defendants and his companions were apprehended. This was early August, when the days are long. If the burglary occurred before defendant joined Raymer and Skaggs at 8 p. m., it necessarily occurred during daylight hours and there would have been no need for a flashlight. Its presence on top of the stolen articles in the pillowcase indicates its use in the burglary and that the burglary occurred after dark when the flashlight was needed. If it occurred after dark, it necessarily was while defendant admittedly was with Raymer and Skaggs.

The presence of two pair of gloves in the pillow slip further supports a finding that the defendant participated in the burglary. These also were on top of the contents and would indicate that two people wore them while committing the burglary and stealing the articles from the house. When the automobile was observed and stopped, Joe Skaggs was driving the car. The jury could have found that he was driving at the time of the burglary, that he remained in the car, and that the others (defendant and Raymer) entered the house and committed the burglary and stealing. State v. Murray, Mo., 445 S.W.2d 296.

The fact that the driver was exceedingly nervous when stopped by the officer, that he was stuttering and stammering and shaking when he talked to Officer Farmer, and that his stories about where they had been and where they were going appeared

to the officer not to be true, all were additional factors which the jury could have considered and which support the sufficiency of the evidence to sustain this verdict.

■ "The possession of recently stolen property which will support an inference of guilt may be a joint possession of the accused and others and such possession need not be separated from all possession by others." State v. Cobb, Mo., 444 S.W.2d 408. We hold that under the evidence in this case and the inferences therefrom, defendant, jointly with Raymer and Skaggs, had actual and exclusive possession of the items stolen from the Sandoz house, which possession will support an inference of guilt on the part of this defendant. Such inference is supported further by the testimony of Lt. Gooch that he found Mrs. Sandoz's rings on the ground at the edge of the right front door of the Pontiac at the place where the car had been stopped by the police. Defendant was seated in the right front seat next to that door and was nearest the point where those rings were found. The jury could have found that these rings were dropped outside that door by the defendant when they were stopped and questioned by the police. The evidence of possession of recently stolen property, coupled with the testimony which indicated that the burglary occurred at a time when defendant testified he was with Raymer and Skaggs, is sufficient to support the verdict of guilty.

Quite understandably, the jury did not believe defendant's testimony that he did not participate in the burglary or have any knowledge thereof, and that he did not even see the orchid pillowcase which was immediately to his left. To accept such a story, the jury would have had to believe that the burglary occurred before the defendant met Raymer and Skaggs at 8 p. m., and that from the time defendant joined them the orchid pillowcase with the loot and tools therein was left between the bucket seats as they visited the various taverns. They also would have had to find that during all of such time when defendant was riding in the car, or entering or leaving it, he did not ever see or become aware of the flowered orchid pillowcase.

We find against defendant on his claim that a submissible case was not made.

Defendant's second contention on appeal is that the trial court erred in overruling his motion to suppress the evidence found in the orchid pillowcase (the stolen merchandise and burglary tools) on the basis that these articles were the product of an illegal search and seizure.

In the first place, it is clear that the action of Officer Farmer in stopping the Pontiac for speeding was not a subterfuge for searching the automobile for evidence of a more serious crime. His attention was attracted to the car originally by what appeared to be excessive speed. He followed the car and checked its speed before stopping it. He was not aware at that time as to who the occupants were, and there is nothing to indicate that he recognized the automobile. When he stopped the Pontiac (as he had a right to do) he still made no arrests. Instead, he asked for the driver's operator's license, and when Skaggs had none he then wrote out a ticket for driving without such license.

While talking to the operator, the officer observed the contents of the car and he noticed the bulging orchid pillowcase between the two front bucket seats of the car. He also noticed that the man in the rear seat was Gerald Raymer, a known police character. When the officer asked to see Skaggs' operator's license, he could not produce one and, instead, told Farmer that the car belonged to Gerald Raymer, the man in the rear seat. Skaggs was very nervous, was stuttering, stammering and shaking. When he was talking to Officer Farmer at the rear of the automobile, he stated that they had been at a tavern on Olive Street Road which Officer Farmer, by reason of his familiarity with the area, had reason to believe did not exist. Skaggs

also indicated that they were headed for his home in Overland at that time, but Officer Farmer knew that they already had passed up the street which would have provided the most direct route to Skaggs' home in Overland. Consequently, there was reason for Farmer to disbelieve this statement. It is true that Farmer had not yet learned of the Sandoz burglary, but he would know, of course, that numerous burglaries occur every day in St. Louis County and City, and he could and did see the bulging orchid pillowcase between the two front seats and it certainly was not the usual, ordinary, expected item which three men would be hauling around with them in that manner at 10 p. m.

■ We believe that the above facts were sufficient to meet the test prescribed in Henry v. United States, 361 U.S. 98, 80 S.Ct. 168, 4 L.Ed.2d 134, and Beck v. State of Ohio, 379 U.S. 89, 85 S.Ct. 223, 13 L.Ed. 2d 142, in that they would warrant a man of reasonable caution in believing that a felony had been committed and constituted probable cause for the arrests on suspicion of burglary and stealing which Officer Farmer made. " * * * The rule of probable cause is a practical, nontechnical conception affording the best compromise that has been found for accommodating * * * often opposing interests. Requiring more would unduly hamper law enforcement. To allow less would be to leave law-abiding citizens at the mercy of the officers' whim or caprice." Brinegar v. United States, 338 U.S. 160, 176, 69 S.Ct. 1302, 93 L.Ed. 1879. Applying this test in Gullett v. United States, 387 F.2d 307, the United States Court of Appeals for the Eighth Circuit held that there was probable cause for a warrantless arrest and for a search of the automobile incident to that search. In our view, the factual situation here presented is sufficiently comparable to that in Gullett as to result in a similar conclusion. Accordingly, we hold that there was probable cause for the arrests and that a contemporaneous search of defendant and of the automobile incident to

that arrest was permissible. Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543, 39 A.L.R. 790; Gullett v. United States, supra; Brown v. United States, 125 U.S.App.D.C. 43, 365 F.2d 976. A good statement of the rule applicable is contained in Hotis, "Search of Motor Vehicles," 73 Dickinson Law Review 363, 441, as follows: "Accordingly, once a bona fide stop or arrest has been made for a minor violation, the police can make an additional arrest for any other offense unexpectedly discovered during the course of the investigation. If, while questioning a motorist regarding the operation of his vehicle, an officer sees evidence of a criminal violation in open view, or in some other manner acquires probable cause on a more serious charge, he may arrest for that offense and incident thereto conduct an additional search for physical evidence. Under these circumstances, neither the arrest nor the search is tied to the traffic charge, but rather to the violation later discovered."

We overrule plaintiff's second contention.

Finally, defendant claims error in the admission in evidence of the two rings belonging to Mrs. Sandoz which were found on the ground adjacent to where the Pontiac was stopped by the officers. This objection was asserted on the basis the rings were not referred to or itemized in the information charging the offense.

■ There is no merit in this contention. The proof clearly established that these rings belonged to Mrs. Sandoz and had been stolen at the same time as the various other items which were itemized in the information. The rings were found at the scene where the Pontiac was stopped and the rest of the stolen articles recovered. The rings were admissible in evidence as constituting a part of the entire transaction and as evidence to connect this defendant with the possession of the stolen articles. State v. McBride, Mo., 366 S.W. 2d 374, 378 [7]; State v. Hedgpeth, 311 Mo. 452, 459, 278 S.W. 740, 742 [4, 5].

The defendant could not have been convicted for stealing these rings because Instruction No. 2, which submitted the issue of whether defendant was guilty of stealing in connection with the burglary, limited the jury's consideration to specific items all of which were itemized in the information.

Judgment affirmed.

MORGAN, J., concurs.

DONNELLY, P. J., concurs in separate concurring opinion filed.

DONNELLY, Presiding Judge (concurring).

I expressed my view on the question of submissibility in this type of case in a dissenting opinion in State v. Cobb, Mo. Sup., 444 S.W.2d 408, at 416. I now defer to the majority view of this Court as expressed in State v. Cobb, supra, and concur.